97 F.3d 1536
 65 USLW 2259, 12 IER Cases 1833
 Bradley L. McCLOUD; Ronald E. Huber; Carol A. Devore;
Elsa C. Giammarco; C. Calvin Skaates; Terrence
B. Cohen; Gloria Jean Morgan; Vernon
E. Hysell; and Teresa L.
Tilson, Plaintiffs-Appellees,
v.
Joseph W. TESTA, Defendant-Appellant.
 No. 94-4144.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 3, 1995.
Decided Oct. 21, 1996.
Rehearing and Suggestion for Rehearing En Banc Denied
February 13, 1997.
 
 John S. Marshall, Spater, Gittes, Schulte & Kolman (briefed), Columbus, OH, Louis A. Jacobs (argued and briefed), Upper Arlington, OH, for Plaintiffs-Appellees.
 Bonnie L. Maxton, Prosecuting Attorney's Office for the County of Franklin (argued), Elizabeth A. Scott and Donald M. Collins (briefed), Columbus, OH, for Defendant-Appellant.
 Before: JONES and BOGGS, Circuit Judges; and COFFMAN, District Judge.*
 BOGGS, Circuit Judge.
 
 
 1
 Defendant Joseph W. Testa brings this interlocutory appeal[1] from the district court's refusal to grant his motion for summary judgment on grounds of qualified immunity in this § 1983 political patronage case brought by several dismissed Franklin County, Ohio Auditor's Office employees. We affirm in part and reverse in part.
 
 
 2
 * Testa was appointed to serve out the term of Palmer McNeal as Franklin County, Ohio Auditor[2] in May 1992, after McNeal resigned upon conviction of an abuse of trust offense under Ohio law. McNeal and Testa had been friends, and in fact Testa had once worked for McNeal when the latter was Franklin County Recorder. However, the men are now bitter enemies, as each is currently associated with a different faction of the Franklin County Republican Party. John Walton ("J.W.") Wolfe, the late owner of the Columbus Dispatch, was the originator of one faction. Roger Tracy, himself a former County Auditor, established the other faction. McNeal cast his lot with Tracy, and Testa with Wolfe. The rivalry between the Wolfe and Tracy factions of the Franklin County Republican Party is long-standing and rancorous, but seems to have no particular ideological content.[3] Testa disputes whether these factions exist, claiming that the plaintiffs can offer no objective evidence of the existence of the factions, and argues that his animosity toward McNeal is purely personal. The plaintiffs argue that the rift between Testa and McNeal is not based on pure personal dislike, but on political rivalry, and cite a number of local news reports to buttress this contention.
 
 
 3
 When Testa became County Auditor he fired a number of workers in the County Auditor's office, nine of whom, including McCloud, are the plaintiffs in this action. The plaintiffs argue that as political associates of McNeal, they were fired by Testa solely because of their affiliation with the Tracy faction of the Franklin County Republican Party. All of the plaintiffs actively campaigned for McNeal, some had earlier campaigned for Tracy, and some were even members of the Franklin County Republican Central Committee.
 
 
 4
 Testa fired these nine employees by simply calling them during the weekend of May 23-25, 1992 and telling them not come to work the following Monday. The parties do not dispute that Testa had the authority under Ohio law to make this employment determination. Testa maintains that he consulted with other County Auditor's office employees about the responsibilities of the fired workers, sitting down with a brief indication of their functions contained on a telephone list and perhaps their payroll records, in order to decide which workers would be retained in his effort to streamline the office, and which would not. He concedes, however, that he fired some of the workers because they had a "fiduciary" or confidential relationship with former County Auditor McNeal. Testa hints in a number of places in his brief that he was acting out of a perceived need to "clean up" the office's public image in the wake of the McNeal scandal. In conjunction with these hints, Testa claims that he was envisioning that under his leadership all of the positions occupied by the plaintiffs would take on either policymaking or confidential responsibilities[4], implying that a reformer must be able to place complete trust in his lieutenants.
 
 
 5
 The job responsibilities of each plaintiff, along with Testa's proffered reasons for terminating that person, are listed below:
 
 
 6
 1. Bradley L. McCloud: McCloud was the former staff attorney in the Auditor's office and his primary function was to represent the County in unemployment compensation hearings. Testa says he fired McCloud because McCloud was a member of McNeal's administrative staff and because under Ohio law the office had the right to call on the Franklin County Prosecuting Attorney for legal assistance, making McCloud's legal services superfluous.
 
 
 7
 2. Ronald E. Huber: Huber was the real estate division administrator in the office. He was responsible for real estate valuation for property tax purposes. Testa claims he fired Huber because Huber was a confidential and "fiduciary" associate of McNeal, and because the real estate division was the largest in the office, giving Huber significant policymaking duties. Huber supervised over 50 employees and administered a budget of 7-9 million dollars annually.
 
 
 8
 3. Carol A. Devore: Devore was the automated mapping administrator in the office. She was automating maps of taxable real estate in the county. Testa says he fired her because of her confidential and "fiduciary" relationship with McNeal.[5]
 
 
 9
 4. Elsa C. Giammarco: Giammarco was the administrator of the consumer services division in the Office. She had a grab-bag of responsibilities ranging from issuing dog licenses to administering homestead tax reductions for senior citizens. Testa offers the same confidential and "fiduciary" relationship explanation he offers for firing Devore, but adds that Giammarco was also McNeal's lobbyist to the Ohio General Assembly.
 
 
 10
 5. C. Calvin Skaates: Skaates was the personal property tax administrator. Skaates distributed, collected and audited property tax returns. Testa says he fired him because of his confidential and "fiduciary" relationship with McNeal.
 
 
 11
 6. Terrence B. Cohen: Cohen was the former budget and settlement division administrator. He audited the county's political subdivisions. Testa claims he fired him because of his confidential and "fiduciary" relationship with McNeal. Cohen's position was also eliminated when Testa became County Auditor, and his functions were transferred to other office employees.
 
 
 12
 7. Gloria Jean Morgan: Morgan was the estate tax administrator. Testa claims he fired her because of her confidential and "fiduciary" relationship with McNeal.
 
 
 13
 8. Vernon E. Hysell: Hysell worked in the estate tax division as a liaison to townships for the office. He was also responsible for inventorying safety deposit boxes. Testa says he fired Hysell because of his confidential and "fiduciary" relation with McNeal. Hysell's functions as township liaison were transferred to other office employees when Testa became County Auditor.
 
 
 14
 9. Teresa L. Tilson: Tilson was an administrative assistant to former Chief Deputy Auditor Robert Everhart[6], who was the immediate supervisor of the office's Division Administrators. Tilson kept track of the office's payroll and billings. Testa says he fired Tilson because of her confidential relationship to both Everhart's and McNeal's positions.
 
 
 15
 On July 31, 1992, these plaintiffs brought a § 1983 action against Testa, in both his individual and official capacities, and Franklin County, Ohio for an alleged violation of their First Amendment rights to be free of patronage dismissals.[7] After both sides had engaged in some measure of discovery, Testa moved for summary judgment on a number of grounds. The district court partially granted Testa's motion, but denied summary judgment on the issue of qualified immunity. That denial is the subject of this timely interlocutory appeal.
 
 
 16
 II. STANDARD OF REVIEW AND INTERLOCUTORY JURISDICTION
 
 
 17
 The parties (mostly Testa) urge on us a number of standards of review and related presumptions, only some of which are germane to this case. A recent Supreme Court case complicates our selection of a standard of review by intermeshing that inquiry with the issue of our jurisdiction over the interlocutory appeal of a denial of qualified immunity. To the extent these two inquiries are separable, we first consider the standard of review and then address the question of jurisdiction.
 
 A. Standard of Review
 
 18
 We start with basics. We review the denial of summary judgment on grounds of qualified immunity de novo because application of this doctrine is a question of law. Mumford v. Zieba, 4 F.3d 429, 432 (6th Cir.1993). As we shall see in our discussion of the various rules cited to us by the parties, this is the only rule relevant to our choice of a standard of review in this case. Nevertheless, because this is a confusing area of the law, we go on to address the other rules invoked by the parties and organize these rules in a useful framework.
 
 
 19
 Testa points out correctly that he has met his preliminary burden of showing that the plaintiffs' dismissals were within his discretionary authority. Thus, the ultimate burden of proof in this suit is on the plaintiffs, who must establish that Testa's conduct violated a federal right so clearly established that any official in his position would have understood that he was under an affirmative duty to refrain from such conduct. Washington v. Newsom, 977 F.2d 991, 995 (6th Cir.1992). If we were reviewing a summary judgment motion in a non-interlocutory appeal, we would have to give the benefit of the doubt as to any material factual disputes to the plaintiffs. Faughender v. City of North Olmsted, 927 F.2d 909, 911-12 (6th Cir.1991). For reasons we discuss below, however, neither the assignment of the burden of proof to the plaintiffs in this case, nor the commonplace of summary judgment law that we must give the non-moving party the benefit of any factual disputes, has any bearing on how we must approach this appeal.
 
 
 20
 A number of doctrines urged upon us bearing on the standard of review are not relevant to deciding the issue of whether the district court properly denied summary judgment on grounds of qualified immunity to Testa. Clarifying how these doctrines appertain to this case will nevertheless help to dispel confusion. It can be properly observed that burdens of proof, levels of scrutiny, and canons of constitutional or statutory interpretation create proof thresholds and function as tie-breaking rules in legal disputes--rules that determine the victor as to a particular issue when the proper result as a matter of law, or in terms of the sufficiency of supporting facts, is unclear.
 
 
 21
 In the context of this case there are three kinds of tie-breaking rules that could conceivably be brought into play, though only some of them are pertinent. First, when the law is unclear, public officials performing discretionary functions are entitled to qualified immunity in their individual capacities. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, individual capacity defendants in § 1983 cases receive some benefit from legal doubt about the clarity of existing law. A corollary of this rule in the First Amendment patronage context is that the Branti v. Finkel, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294-95, 63 L.Ed.2d 574 (1980) exception (see below) in political patronage cases is to be construed broadly, so as presumptively to encompass positions placed by the legislature outside of the "merit" civil service. [Hereinafter referred to as the Rice canon.] Rice v. Ohio Dep't of Transp., 14 F.3d 1133, 1143 (6th Cir.) ("Even after Elrod and Branti, the legislature's decision as to whether a particular job should be classified as political or nonpolitical is at least entitled, as the First Circuit has said, to 'some deference.' ") (quoting Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 246 (1st Cir.1986) (en banc)), cert. denied, 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994)[8]; Walton v. Michigan, 918 F.2d 958, 1990 WL 182033, at ** 5 (6th Cir.1990) (unpublished per curiam) ("Legislative solutions may themselves prove problematic, but so may judicial remedies--and when the solution does not purport to be based on the Constitution, the voters can at least get it changed if they think it needs changing."). Consequently, individual defendants in § 1983 patronage cases receive some additional benefit from legal doubt, other than that provided by qualified immunity doctrine generally, about how particular employment positions are situated in relation to the Branti exception.
 
 
 22
 Second, the burden of proof in qualified immunity cases is on the plaintiffs. Washington, 977 F.2d at 995. So, individual capacity defendants in these cases receive some benefit from factual doubt. Third, the government's proffered justifications for patronage practices must satisfy strict scrutiny. Elrod v. Burns, 427 U.S. 347, 363, 96 S.Ct. 2673, 2685, 49 L.Ed.2d 547 (1976) (plurality) ("In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights."); Rutan v. Republican Party of Ill., 497 U.S. 62, 74, 110 S.Ct. 2729, 2736-37, 111 L.Ed.2d 52 (1990) (same); Decore v. City of Parma, 977 F.2d 580, 1992 WL 274506, at ** 4 (6th Cir.1992) (unpublished) (same).[9] Therefore, the plaintiffs in § 1983 patronage cases receive some benefit from legal doubt relating to the government's justifications for patronage as a practice.
 
 
 23
 Resolving how these three tie-breaking rules interact in the context of qualified immunity patronage cases is complex, but not inordinately so. We initially observe that the application of strict scrutiny in patronage cases no longer need concern the courts of appeals and the district courts. Therefore, the third tie-breaking rule discussed above is, for all practical purposes, irrelevant to this case. The Supreme Court has applied strict scrutiny to patronage employment practices on a one-time basis and determined that patronage is constitutionally permissible only where political affiliation is an appropriate qualification for the particular employment positions involved (the Branti exception). "We need not inquire, however, whether patronage promotes the party system or instead serves to entrench parties in power, for Elrod and Branti establish that patronage does not justify the coercion of a person's political beliefs and associations." O'Hare Truck Serv., Inc. v. City of Northlake, --- U.S. ----, ----, 116 S.Ct. 2353, 2357, 135 L.Ed.2d 874 (1996). Now the lower federal courts need only apply this Branti test; they do not have to apply strict scrutiny in each individual case. "In Branti, we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that 'party affiliation is an appropriate requirement for the effective performance of the public office involved.' " Rutan, 497 U.S. at 71 n. 5, 110 S.Ct. at 2735 n. 5. "[T]he inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed." O'Hare, --- U.S. at ----, 116 S.Ct. at 2358.
 
 
 24
 Furthermore, in an interlocutory appeal such as this, the heart of the dispute is frequently over whether the particular positions of public employment occupied by the plaintiffs fall into or outside of the Branti exception. Qualified immunity, the first tie-breaking rule, comes into play to the extent there is uncertainty about where to locate the plaintiffs' positions with respect to the Branti exception. Its corollary, the Rice canon, which in some circumstances gives deference to a legislature's decision of how to classify a particular employment position in relation to the Branti exception, also involves a pure question of law. By contrast, the burden of proof in qualified immunity cases, the second tie-breaking rule, is placed on plaintiffs only in regard to factual disputes--where whether a defendant actually committed the acts that are alleged to be in violation of federal law is the salient issue. The burden of proof in qualified immunity cases is thus a tie-breaker in regard to facts, and the doctrine requiring legal clarity before piercing qualified immunity, of which the Rice canon is a part in First Amendment patronage cases, functions as a tie-breaker in regard to the legal status of employment positions vis a vis the Branti exception.
 
 
 25
 Unfortunately, both of these factual and legal tie-breaking rules are relevant to this case. There is a factual dispute about Testa's motivation in terminating the plaintiffs and about his good faith intentions as to the prospective functions of the relevant positions as he envisioned them. There is also a legal dispute about which positions, if any, should fall within the Branti exception, even if the plaintiffs' version of the facts is assumed to be true. Additionally, to resolve this legal question, we need to keep in mind the deference that it might be appropriate to give to the Ohio legislature's classification of the particular positions involved in this case.[10] We also need to remember that, once the facts are clear, if the resolution of the ultimate constitutional questions in this case are not self-evident, we would be compelled to affirm the grant of qualified immunity to Testa in his individual capacity. Finally, as an additional guidepost we note that, as a practical matter, invocation of the Rice canon and the general availability of qualified immunity will move in tandem, because if it is already clearly established that a particular position falls into or outside of the Branti exception, then there is no need to invoke the Rice canon and correspondingly it is appropriate to grant or deny qualified immunity. Correlatively, the Rice canon will tend to be invoked in cases where an assertion of qualified immunity may also prove successful.
 
 B. Interlocutory Jurisdiction
 
 26
 The existence of a factual dispute has consequences for the scope of our interlocutory jurisdiction in this case, as well as our choice of a standard of review. Testa attempts to use the factual uncertainties in this case to argue that he is entitled to qualified immunity. This case is an interlocutory appeal of the denial of a motion for summary judgment, however, and therefore we lack the jurisdiction to address the propriety of refusing to grant summary judgment to Testa on the basis of any factual disputes. Indeed, pending before this court is a motion to dismiss the entire appeal for lack of jurisdiction.
 
 
 27
 Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), permits interlocutory appeals of denials of motions for summary judgment on the grounds of qualified immunity. The scope of Mitchell has recently been clarified by the Supreme Court in Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Johnson "hold[s] that a defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Id. at ----, 115 S.Ct. at 2159. The plaintiffs claim that the district court's denial of summary judgment here falls within the jurisdictional ban of Johnson, because the district court, when it denied Testa's summary judgment motion for qualified immunity, found that there were genuine issues of material fact in regard to three issues: (1) whether or not the job positions of the plaintiffs were inherently political in nature; (2) whether those job positions were inherently political as envisioned by the new County Auditor; and (3) whether Testa was actually motivated by the plaintiffs' political affiliations in firing them. We agree with the plaintiffs that we lack the jurisdiction under Johnson to consider the propriety of any of these rulings, but disagree with the plaintiffs' assertion that Johnson divests this court of the entirety of its jurisdiction over all issues in this appeal.
 
 
 28
 In Johnson, the Supreme Court held that an interlocutory appeal of qualified immunity could not be entertained where there was a genuine issue of material fact about whether the police officers who were the defendants in a § 1983 action for the use of excessive force were actually present at or had actually participated in the beating of the plaintiff. However, "Johnson reaffirmed that summary-judgment determinations are appealable when they resolve a dispute concerning an 'abstract issue of law' relating to qualified immunity." Behrens v. Pelletier, --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996) (quoting Johnson, 515 U.S. at ----, 115 S.Ct. at 2158). It should be clear that Johnson 's distinction between questions of law and questions of fact precludes our jurisdiction over whether a district court properly concludes in a particular case that genuine issues of material fact block a grant of summary judgment. The question of the actual job responsibilities of the plaintiffs in this case is disputed, and therefore we have no jurisdiction to consider the district court's denial of summary judgment on this basis. The question of Testa's purpose in firing the plaintiffs and the question of whether the nature of the functions of the plaintiffs' positions would change once Testa took over as County Auditor are questions of intent, and therefore we also have no jurisdiction to review them. In fact, the example that the Johnson Court chose to illustrate what kinds of cases it wanted to prevent the courts of appeals from exercising jurisdiction over focused on intent:
 
 
 29
 Many constitutional tort cases, unlike the simple "we didn't do it" case before us, involve factual controversies about, for example, intent--controversies that, before trial, may seem nebulous. To resolve those controversies--to determine whether there is or is not a triable issue of fact about such matter--may require reading a vast pretrial record, with numerous conflicting affidavits, depositions and other discovery materials.
 
 
 30
 Id. at ----, 115 S.Ct. at 2158.
 
 
 31
 Johnson leaves open the question of whether it may be appropriate, when an interlocutory appeal includes a straightforward issue of law, for a court of appeals to exercise pendent appellate jurisdiction over a question of fact. Id. at ----, 115 S.Ct. at 2159. Until recently, only one published opinion in the Sixth Circuit had addressed pendent appellate jurisdiction, and it declined to employ the doctrine, noting that the doctrine has never been adopted in the Sixth Circuit. Williams v. Kentucky, 24 F.3d 1526, 1542 (6th Cir.1994). However, in Brennan v. Township of Northville, 78 F.3d 1152, 1157-58 (6th Cir.1996), we adopted the doctrine of pendent appellate jurisdiction.[11] Testa does not argue that this discretionary doctrine should be invoked in this case and therefore we need not address its applicability here.[12]
 
 
 32
 Our decision to exercise jurisdiction in this case is supported by Blair v. Meade, 76 F.3d 97, 100 n. 2 (6th Cir.1996), where the court held that it had interlocutory jurisdiction to consider the appeal of a district court's denial of qualified immunity in a patronage case, despite the fact that the district court thought there were disputed issues of motivation, because, regardless of the factual dispute, the plaintiffs did not have a valid claim under the First Amendment. Failure to address legal questions could easily lead to an evisceration of the important and broader efficiency benefits of qualified immunity itself--benefits which embody the entire purpose behind allowing interlocutory appeals in this sort of case. If Testa prevails in this interlocutory appeal, then the costs of further discovery and the expense of trial and perhaps another appeal can be saved. Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815 (qualified immunity is more than a "mere defense to liability"--it is an entitlement to immunity to suit--and it should be decided early so as to avoid the costs attendant upon further litigation).[13]
 
 
 33
 Two legal issues remain for proper interlocutory appeal in this case.[14] First, we hold we have jurisdiction to review Testa's purely legal argument that he is entitled to qualified immunity because the discharge of members of one faction of the same party by a member of another faction of the same party, where the factions are associational groups only, and have no particular ideology, is not a violation of clearly established First Amendment rights. Second, we hold that we have jurisdiction to review Testa's argument that the law was not sufficiently clear that plaintiffs' positions did not fall into the Branti exception. Our court in Blair, 76 F.3d at 99-102, reached a similar conclusion as to jurisdiction. In Blair, we held that a chief financial officer and assistant financial officer to a county judge executive fell within the Branti exception, after concluding that interlocutory jurisdiction existed over a district court order denying qualified immunity because the issue of whether the dismissal of these employees was substantially motivated by the employees' political affiliations was disputed. Ibid.
 
 
 34
 We will review the two legal questions over which we have jurisdiction de novo. In doing so, we can ignore factual disputes about Testa's motivation in firing the plaintiffs and about what Testa truly envisioned the functions of the plaintiffs' jobs would be. We can also ignore the procedural posture of the case as the review of a motion for summary judgment, the allocation of the ultimate burden of proof on the issue of qualified immunity to the plaintiffs, and the application of strict scrutiny to governmental justifications for political patronage. We can ignore all three of the tie-breaking rules discussed above because they are brought into play at the fact-finding level of the judicial process and they have no application in an interlocutory appeal where our jurisdiction is limited to addressing legal quandaries.
 
 
 35
 III. STATUS OF NON-IDEOLOGICAL FACTIONS AND THE AVAILABILITY
 
 OF QUALIFIED IMMUNITY
 
 36
 In this case we must resolve two complex and recondite legal issues. First, we need to decide whether the First Amendment prohibits adverse employment actions taken by a member of one faction of a political party against public employees of a rival faction of the same political party, when the factions involved have no discernible ideological differences. We convert dicta in a number of Supreme Court and Sixth Circuit cases into the express holding of this case and conclude that First Amendment protection extends even to shield members of one such faction from adverse employment actions taken by members of another such faction of the same political party. We also conclude that this proposition is clearly established.
 
 
 37
 Second, we must decide how the Supreme Court's Branti exception to the right to be free of patronage dismissals, which excludes from First Amendment protection adverse employment actions involving public offices where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance" of that office, Branti, 445 U.S. at 518, 100 S.Ct. at 1294, interacts with the availability of qualified immunity in § 1983 cases. We conclude that it is improper to grant qualified immunity to every defendant who has taken an adverse employment action against a plaintiff occupying or previously occupying a public office that the Supreme Court or the Sixth Circuit has not yet explicitly held falls into or outside of the Branti exception. In doing so, we give more precise content to the Branti exception, so that we can better delineate those public positions that as a general matter should receive First Amendment protection, and those that should not.
 
 
 38
 A. Patronage Dismissals Involving Non-Ideological Factions
 
 
 39
 of the Same Political Party
 
 
 40
 In addressing the question of whether an adverse employment action taken against members of a non-ideological faction by members of similar factions violates the First Amendment, we first consider the Supreme Court's cases in the area, which we read to support the conclusion that non-ideological factions should receive First Amendment protection. Then we discuss cases from the courts of appeals, the bulk of which we also read to reach a similar conclusion, while rejecting the holding of another circuit and dicta in our own circuit to the contrary. We reinforce our conclusion that non-ideological factions are protected by enumerating various supporting policy considerations, and then by anchoring our conclusion in a comparison with related Supreme Court associational rights cases. Finally, we reason that because legal support for the conclusion that non-ideological factions should not be protected is relatively slight, the constitutional protection of non-ideological factions is clearly established. Thus, we deny qualified immunity to Testa with respect to this argument.
 
 
 41
 Testa argues that it has not been clearly established that mere personal affiliation with a political rival, or affiliation with a non-ideological faction, assuming the alleged factions in this case exist, are protected from patronage dismissal under the First Amendment. Specifically, Testa argues that it is unclear whether adverse employment actions taken by members of a faction having no expressive advocacy purpose against members of a similar faction, where factional affiliation is an inappropriate requirement for the position at issue, is a violation of the First Amendment.
 
 
 42
 Testa argues that none of the "big three"[15] Supreme Court cases in this area compels a particular answer to the question of whether affiliation with a non-ideological faction should receive First Amendment protection. It is true that the two opinions that Justice Brennan authored in this area of the law, Elrod and Branti, consistently refer to the need for protecting freedom of belief and association in the patronage context, but the results in each of the four Supreme Court patronage cases would have been the same even if only freedom of political belief was the animating force behind those opinions. Elrod involved the discharge or threat of discharge by Democrats of employees who were not members of the Democratic party. Branti involved the discharge of Republican assistant public defenders by a newly-appointed Democratic public defender. Rutan involved discrimination in hiring against non-Republican party members by a Republican governor's hiring freeze policies. O'Hare involved an accusation by a municipal contractor that he was removed from a rotating list for tow truck services because he failed to contribute to a mayor's reelection campaign and openly supported the mayor's challenger. Significantly, the Court never so much as mentioned the political parties of the contractor, the mayor, or the mayor's challenger. Neither did the district court or the Seventh Circuit on appeal. O'Hare Truck Serv., Inc. v. City of Northlake, 843 F.Supp. 1231 (N.D.Ill.1994), aff'd, 47 F.3d 883 (7th Cir.1995), rev'd, --- U.S. ----, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).
 
 
 43
 Dicta in the Supreme Court's opinions bearing on whether non-ideological factions of the same party should receive First Amendment protection from patronage is arguably ambiguous. On the one hand, in Elrod a plurality of the Court expressed concern that the practice of patronage ultimately worked to the "detriment" of a public employee's "own beliefs." Elrod, 427 U.S. at 355, 96 S.Ct. at 2681 (emphasis added). In a footnote, the Court also indicated that patronage focuses on the ideas expressed by persons or groups subject to it. Id. at 363 n. 17, 96 S.Ct. at 2684 n. 17. The Court summarized the holding of the Elrod plurality opinion as "requir[ing] only that the rights of every citizen to believe as he will and to act and associate according to his beliefs be free to continue...." Id. at 372, 96 S.Ct. at 2689 (emphasis supplied). In Branti, the Court indicated its agreement with the thrust of Elrod that the practice of patronage had "a significant impact on the formation and expression of political beliefs." Branti, 445 U.S. at 513 n. 8, 100 S.Ct. at 1292 n. 8 (emphasis supplied). Branti also distinguished the patronage line of cases from the Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), line of cases on the basis that the former protects freedom of belief for public workers, and the latter freedom of speech for public workers. Branti, 445 U.S. at 515, 100 S.Ct. at 1293. See O'Hare, --- U.S. at ---- - ----, 116 S.Ct. at 2357-58 (noting the differences between the Elrod-Branti-Rutan lines of cases and the Pickering line of cases); Umbehr, --- U.S. at ----, 116 S.Ct. at 2370 (Scalia, J., dissenting) (calling the distinction the Court drew between these two lines of cases "novel"). See also supra n. 9. Rutan reiterated that the animating concern in Elrod and Branti was to avoid the "chilling" effects that patronage had on belief. "[Public employees subjected to patronage] will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder." Rutan, 497 U.S. at 73, 110 S.Ct. at 2736. Rutan also noted that patronage "impairs the elective process by discouraging free political expression by public employees." Id. at 75, 110 S.Ct. at 2737 (emphasis supplied).
 
 
 44
 On the other hand, perhaps the best evidence that the Elrod-Branti-Rutan line of cases meant to place strict limits even on non-ideological patronage is Justice Scalia's dissent in Rutan. "What the patronage system ordinarily demands of the party worker is loyalty to, and activity on behalf of, the organization itself rather than a set of political beliefs." Rutan, 497 U.S. at 109, 110 S.Ct. at 2755 (Scalia, J., dissenting). In rejecting this argument, a majority of the Court gave a strong indication that its disapproval of patronage was based on its potential to affect political belief, and on its infringement of the right of association, not on any individualized demonstration that freedom of belief was in jeopardy. The Branti Court emphasized that First Amendment protection in this area protected the "formation " of "political beliefs."
 
 
 45
 Moreover, dicta and holdings in our own circuit strongly and nearly without exception support the concept of applying the ban on patronage employment practices to non-ideological factions within the same party. In Crumbley v. Swietyniowski, 828 F.2d 19, 1987 WL 44585 (6th Cir.1987) (unpublished per curiam), we applied Branti to the dismissal of a Democratic secretary by a Democratic mayor. There was no discussion of ideological differences between the two individuals involved. And in Rice v. Ohio Dep't of Transp., 887 F.2d 716 (6th Cir.1989), cert. granted and judgment vacated on other grounds, 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d 744 (1990), we failed to comment negatively, on the basis that the dispute was non-ideological, on a First Amendment patronage-based § 1983 claim by a Republican who argued he was not promoted because he was told he was not donating enough money to the Republican party. In another case, we explicitly stated that, "[a]lthough the dispute in Branti concerned membership in different political parties, the reasoning of the Supreme Court in that case has been understood to apply to political differences of any kind, not merely differences in party membership. See, for example, Balogh .... In this case, as in Balogh, 'political affiliation' refers to commonality of political purpose and support, not political party membership." Williams v. City of River Rouge, 909 F.2d 151, 153 n. 4 (6th Cir.1990). (Balogh did not reveal the political party affiliation of either plaintiff or defendant.)[16] Accord Faughender, 927 F.2d at 914 n. 2; Mumford, 4 F.3d at 433 n. 9. See also Walton, 918 F.2d 958, 1990 WL 182033 (terminated public employee was member of the same political party as the defendant employer, but claimed she was fired because she did not campaign for the defendant, did not contribute to his campaign fund, and did not assist him in his effort to be chosen chief judge); Monks v. Marlinga, 923 F.2d 423 (6th Cir.1991) (winner of a Democratic party primary who ultimately also won the general election fired supporters of his opponent in the primary); Picha v. City of Parma, 958 F.2d 372, 1992 WL 57419 (6th Cir.1992) (unpublished per curiam) (plaintiff was patronage victim of Democratic primary); Decore, 977 F.2d 580, 1992 WL 274506 (same); Neice v. Sawyer, 65 F.3d 169, 1995 WL 510022 (6th Cir.1995) (unpublished per curiam) (same).[17]
 
 
 46
 Testa cites some Sixth Circuit authority to support his position that he is entitled to qualified immunity in this context. Again, however, Testa relies on facts that are in dispute. Testa claims that his animosity toward McNeal and his associates, the plaintiffs in this case, is purely personal. The plaintiffs, however, claim that Testa's animosity has political dimensions. Unfortunately for Testa, we have jurisdiction to address his legal claim for qualified immunity only to the extent it is based on the plaintiffs' version of these disputed facts. For this reason, Testa's citation to Avery v. Jennings, 786 F.2d 233 (6th Cir.), cert. denied, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986), is inapposite. Avery holds that giving a preference to members of one's own party in hiring is not impermissible under the First Amendment where this test is not "strict," i.e., where the hiring practice does not per se exclude non-members of a party simply because of their political affiliation. It is true that Avery suggests that adverse employment decisions taken out of purely personal motives do not implicate the First Amendment, but here, even by Testa's own admission, his decision to terminate the plaintiffs was more than purely personal. After all, Testa does not claim he fired the plaintiffs because he personally disliked them, but because he personally disliked their political patron. Moreover, in a case decided after Avery we held squarely: "The political motivations underlying this case are personal, not partisan, but this does not remove them from examination under Branti." Faughender, 927 F.2d at 914.
 
 
 47
 In light of Faughender, we also decline to follow Correa v. Fischer, 982 F.2d 931 (5th Cir.1993) (discharge of former county attorney's office staff because the new county attorney strongly disliked his predecessor is not a violation of the First Amendment). Moreover, even if Faughender were not the law in the circuit, given the limitations on our jurisdiction in this interlocutory appeal, we must assume that the plaintiffs were discharged for their association with an identifiable political faction. This discharge of members of a faction is distinguishable from the informal hiring networks that passed First Amendment muster in Avery. For similar reasons, Testa's citation to Boger v. Wayne County, 950 F.2d 316 (6th Cir.1991), is inapposite. Boger was a case in which the defendants' motivations for a personnel transfer that gave rise to a § 1983 patronage suit were disputed. The court's statement in Boger that a patronage claim would have to be dismissed because the plaintiff's affiliation with a controversial individual was "simply a personal alliance" is not binding on us, because in that case the court had adequate grounds to affirm the district court's grant of summary judgment to the defendants on the basis that the plaintiff had failed to present "any probative evidence that her alliance ... was a motivation for her transfer." Boger, 950 F.2d at 323.
 
 
 48
 We conclude that there are important reasons to extend explicitly the Elrod-Branti-Rutan protection to non-ideological political factions of the same party. First, patronage favors incumbent factions, Elrod, 427 U.S. at 356, 96 S.Ct. at 2681. While the ostensible Tracy and Wolfe factions currently appear to be non-ideological, there is always the potential that they could become ideological. Therefore, the practice of patronage by either faction could favor a potentially ideological faction, and could impinge upon freedom of belief in the future. This potential interference with political beliefs warrants cloaking even current non-ideological factions with First Amendment protection. In Anderson v. Celebrezze, 460 U.S. 780, 793-94, 103 S.Ct. 1564, 1572-73, 75 L.Ed.2d 547 (1983), the Supreme Court held that a law burdening the associational rights of independent candidates was unconstitutional even though the two existing political parties may have been able to accommodate the beliefs of those independent candidates, because this law would "threaten to reduce diversity and competition in the marketplace for ideas."[18] Anderson was referred to favorably by both the majority and concurring opinions in Rutan. Rutan, 497 U.S. at 82 n. 3, 92 n. 8, 110 S.Ct. at 2741 n. 3, 2746 n. 8. As a notable constitutional law scholar has commented: "Freedom of political association, which (without serious controversy) has been held to be fully protected, is not even mentioned in the [Constitution].... It requires a theory to get us where the Court has gone. That theory has been the right one, that rights like these, whether or not they are explicitly mentioned, must nonetheless be protected, strenuously so, because they are critical to the functioning of an open and effective democratic process." John Hart Ely, Democracy and Distrust 105 (1980).
 
 
 49
 Second, the doctrine of unconstitutional conditions, which is one of the strongest forces behind the quartet of Supreme Court patronage cases, is implicated thoroughly even when patronage is practiced by non-ideological factions. As the Court stated in Elrod, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially his interests in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' ' " Elrod, 427 U.S. at 359, 96 S.Ct. at 2683 (quoting Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958))). See also Rutan, 497 U.S. at 78, 110 S.Ct. at 2739 (discussing patronage cases as an example of unconstitutional conditions doctrine); O'Hare, --- U.S. at ---- - ----, 116 S.Ct. at 2357-59 (same). Rather than taking the ex ante perspective that a public employee consents to any infringements on his First Amendment rights as a condition of his job, the Supreme Court has chosen to take the ex post perspective and view public employment as a given and any threat to that public employment as an imposition on First Amendment rights essentially equivalent to a statutory ban on the exercise of those rights. The government's conditioning of public employment on particular political affiliations would not be as serious a concern if the government did not have a perceived monopsony power over the availability of many of its employment positions. The "tough-minded distinction between constitutionally protected rights [and] unprotected government privileges [may] have been influenced by the comparatively small economic role [once] played by governmental units.... But today the federal and state governments directly or indirectly control a great proportion of the nation's employment; if one is unable to hold public employment, his chances of personal economic success are significantly limited." William Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439, 1440-41, 1461-52 (1968).[19] Other market failures that the unconstitutional conditions doctrine addresses include collective action problems[20] and negative externalities[21]. Cf. Richard A. Epstein, Foreword: Unconstitutional Conditions, State Power, and the Limits of Consent, 102 Harv. L.Rev. 4 (1987) (arguing that the unconstitutional conditions doctrine is properly considered a remedy for market failures). Market failures in the patronage context have the effect of perpetuating the power of the incumbent party by distorting competition between political parties (and factions within parties). The market failures associated with patronage in public employment are unconnected to political belief or ideology. Hence, the unconstitutional conditions justification for banning patronage under the First Amendment operates regardless of whether factions differ over ideology or over purely personal matters.
 
 
 50
 Third, applying the patronage ban across the board even on non-ideological factions allows courts to avoid the sticky entanglements associated with making controversial decisions about what kinds of disputes are legitimately ideological, and which are non-ideological. One person's petty personal differences might be seen as serious matters of conscience to other individuals. If non-ideological factions did not receive First Amendment protection, courts would also face the difficult question of how to deal with the intensity of political support for some idea. The determination of whether a dispute between two factions was ideological or non-ideological would turn on the level of generality at which the ideological characterization was stated. For instance, at one level of generality, two factions may share a belief in fiscal responsibility. (Indeed, what political party that wants to command substantial public support nowadays can claim it opposes fiscal responsibility?) These hypothetical factions may differ over how strongly they support the goal of fiscal responsibility when it must be traded off against other goals, however. Factions frequently signal their commitment to a belief or goal by using labels such as "moderate" or "extreme." Because the same belief in fiscal responsibility is shared at a high level of generality, could a court realistically say that the dispute between "moderate" and "extreme" supporters of this idea is non-ideological? Yet, failure to do so when the differences between factions were truly minute and perhaps pretexts to mask mere social cliques would make an establishment of the very distinction between ideological and non-ideological factions impossible to achieve in practice. Holding that non-ideological factions are not entitled to First Amendment protection from adverse patronage employment practices would force courts to become involved in hairsplitting and adjudicating factional political disputes.
 
 
 51
 While it is true that associational freedoms are not absolutely protected, we think that the three important policies discussed above distinguish this situation from those where the Court has rejected attempts to expand associational rights. Consider the following cases: City of Dallas v. Stanglin, 490 U.S. 19, 24, 109 S.Ct. 1591, 1594-95, 104 L.Ed.2d 18 (1989) (city ordinance restricting attendance at certain dance halls to minors between 14 and 18 and a limited category of adults did not violate associational freedoms because coming together to engage in recreational dancing is neither an intimate human association nor expressive behavior protected by the First Amendment); New York State Club Ass'n v. City of New York, 487 U.S. 1, 13, 108 S.Ct. 2225, 2234, 101 L.Ed.2d 1 (1988) (city's human rights law prohibiting race and gender discrimination in large private clubs did not infringe intimate associational rights of clubs, or expressive association rights); Board of Dirs. of Rotary Int'l v. Rotary Club, 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987) (application of state law requiring all business establishments to provide equal advantages to people regardless of gender did not unduly interfere with private club's right of free association); Roberts v. United States Jaycees, 468 U.S. 609, 621-23, 104 S.Ct. 3244, 3251-53, 82 L.Ed.2d 462 (1984) (anti-discrimination statute did not infringe intimate associational freedoms or expressive freedoms of private club members). Politics, because it has the undeniable potential to be an ideological activity, is per se expressive. Recreational dancing and the ability to join discriminatory social clubs are activities that can be legitimately differentiated from non-ideological political association, however. See generally Victor Brudney, Association, Advocacy and the First Amendment, 4 Wm & Mary Bill Rts. J. 1 (1995) (distinguishing between groups that are formed primarily for expressive advocacy, those that are formed to provide other sorts of benefits to members, and multi-purpose groups). Of course, some will engage in politics purely for the opportunities for social or economic interaction it provides, but this is not the usual motivation of those engaged in politics. Political association is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect.
 
 
 52
 Given the power of these rationales, and the overwhelming dicta in the circuit that non-ideological factions are protected, we hold, despite other dicta in this circuit and the decision of at least one other circuit to the contrary, that First Amendment protection from adverse employment actions extends to non-ideological factions of a political party.
 
 
 53
 But, in addition to holding that a First Amendment right exists here, we must also address the clarity of this right from a reasonable official's perspective. Government officials performing discretionary functions are protected by qualified immunity against an award of civil damages insofar as their conduct does not violate any clearly established federal statutory or constitutional rights of which a reasonable person would have known. Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987). "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." Cagle, 957 F.2d at 1348 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). To hold that a right is clearly established, a district court in the Sixth Circuit must usually find binding precedent from the Supreme Court, the Sixth Circuit, or from itself. "Although decisions of other courts can clearly establish the law, such decisions must both point [unmistakably] to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." Cagle, 957 F.2d at 1348.
 
 
 54
 We hold that the strong and almost unvarying support for our conclusion that non-ideological factions are entitled to First Amendment protection from adverse patronage employment actions in the dicta of many of our cases forces the conclusion that the First Amendment protection of non-ideological factions was clearly established even before the issuance of this opinion. Testa's claim for qualified immunity based on his non-ideological factions argument, therefore, must be rejected.
 
 
 55
 B. Patronage Dismissals and Qualified Immunity
 
 
 56
 We now move on to examine the second legal issue presented in this interlocutory appeal, which relates to the complicated interaction between the Branti exception and qualified immunity analysis. Initially, we lay out Testa's argument. Then we examine those jobs that the Supreme Court or the Sixth Circuit have held fall into or outside of the Branti exception. Applying what we discern to be the Supreme Court's aim in creating the Branti exception, we reject Testa's argument. We then develop four categories of positions to define the Branti exception. Finally, we apply this newly articulated, but previously immanent, categorical analysis to the employment positions of the plaintiffs in this case. We ultimately conclude that, as matters currently stand, Testa is entitled to qualified immunity with respect to only one of these positions.
 
 
 57
 Testa argues that he entitled to qualified immunity because (1) no precedent in the Sixth Circuit or the Supreme Court indicates that the particular positions occupied by the plaintiffs in this case were protected by the First Amendment under Branti; and (2) factual disputes exist over whether party affiliation is an appropriate requirement for the effective performance of the positions involved, which he argues is especially telling since the plaintiffs' positions must be considered as he envisions them. Baker v. Hadley, 72 F.3d 129, 1995 WL 717029 at ** 4 (6th Cir.1995) (unpublished per curiam) (factual dispute); Cagle v. Gilley, 957 F.2d 1347, 1349 (6th Cir.1992) (particular position); Williams, 909 F.2d at 155 (Branti exception analysis must consider position itself, which includes plans defendant has for the position, rather than the position as currently performed by the plaintiff).
 
 
 58
 As of May 23, 1992, when Testa began dismissing the plaintiffs in this case, there was a sizable body of law in the Supreme Court and the Sixth Circuit addressing the First Amendment rights of workers for whom political affiliation was not a requirement of job performance. Elrod first defined the exception to the constitutional ban on adverse employment actions taken against public workers based on political patronage as embracing only confidential and policymaking positions. Elrod, 427 U.S. at 367, 96 S.Ct. at 2686-87. When the plurality opinion in Elrod was adopted by a majority of the Supreme Court in Branti, however, this test was modified: "In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518, 100 S.Ct. at 1294. Nevertheless, the old labels remain, and for the most part, remove First Amendment protection from the same class of jobs. Thus, the error in using the older nomenclature of Elrod instead of the test employed in Branti will usually be only a formal error. Compare Faughender, 927 F.2d at 917-18 (Bertelsman, J., concurring) (apparently arguing that the exception for confidential positions is separate from the Branti exception); Messer v. Curci, 881 F.2d 219, 221 (6th Cir.1989) (old nomenclature used), cert. granted and judgment vacated on other grounds, 497 U.S. 1001, 110 S.Ct. 3233, 111 L.Ed.2d 745 (1990); and Balogh v. Charron, 855 F.2d 356, 356 (6th Cir.1988) (old nomenclature used) with Christian v. Belcher, 888 F.2d 410, 415 (6th Cir.1989) (emphasizing Branti 's rejection of old nomenclature in Elrod ); and Faughender, 927 F.2d 909, 913 (noting that the district court erred by being too facile in applying "confidential" label to mayor's secretary and ignoring actual functions of position).
 
 
 59
 The first three patronage cases in the Supreme Court, all of which had been decided before 1992, when Testa dismissed the plaintiffs, establish that the following positions clearly fall outside of the Branti exception, and thus adverse patronage employment actions taken with respect to these positions are unconstitutional[22]: (1) chief deputy sheriff of process division who supervises all departments of a sheriff's office working on one floor of the building housing the office (Elrod ), (2) bailiff and security guard at a juvenile court, (3) process servers (Elrod )[23], (3) assistant public defender (Branti ), (4) rehabilitation counselor (Branti ), (5) road equipment operator (Rutan )[24], (5) prison guard (Rutan ), (6) garage worker (Rutan ), and (7) dietary manager with a mental health department (Rutan ).[25] There are no cases in the Supreme Court affirmatively holding that political affiliation is an appropriate consideration for a particular position or that a particular position is policymaking/confidential. However, in Branti the Supreme Court indicated that if state election law required two election judges in each precinct to be from different parties, a Republican judge could be discharged for changing party registration. Branti, 445 U.S. at 518, 100 S.Ct. at 1294-95.
 
 
 60
 Published Sixth Circuit precedent as of May 23, 1992 established that the position of administrative clerk was entitled to First Amendment protection. Conklin v. Lovely, 834 F.2d 543 (6th Cir.1987). On the other hand, the following positions have been explicitly held in the Sixth Circuit to fall within the Branti exception, and therefore are not entitled to First Amendment protection: (1) court bailiff to an elected state trial judge (Balogh )[26], (2) city attorney (Williams ), (3) assistant prosecutor (Monks ); (4) secretary to mayor (Faughender ); (5) chief financial officer to a county judge executive (Blair ); (6) assistant chief financial officer to a county judge executive (Blair ). Additionally, in Christian, we held that genuine issues of material fact with respect to the motivation behind a failure to rehire precluded ruling on whether political affiliation was essential to the position of a county flood plain administrator. Christian, 888 F.2d at 416. And, in Cagle, we ruled that the law was unclear as to whether a deputy sheriff was within the Branti exception or not. (Cagle did not address the apparent holding of a plurality of the Supreme Court in Elrod that a deputy sheriff who ran a process serving division was entitled to First Amendment protection from patronage.) Unpublished Sixth Circuit cases hold that the following additional positions are entitled to First Amendment protection: (1) administrative support employee of a public school (Hanshaw v. Board of Educ. of Carter County, Ky., 943 F.2d 51, 1991 WL 170897 (6th Cir.1991) (unpublished per curiam)), and (2) city chief inspector (Picha )[27]. Finally, in Walton, another unpublished case, this court held that the position of deputy court administrator for probation fell within the Branti exception and therefore was not entitled to First Amendment protection. 918 F.2d 958, 1990 WL 182033, at ** 5.[28]
 
 
 61
 Casting a jaundiced eye over these precedents, Testa notes that he does not discern any precedent holding that even one of the County Auditor's office positions at issue in this case falls into or outside of the Branti exception: (1) staff attorney who represents County Auditor in unemployment compensation hearings, (2) real estate division administrator, (3) automated mapping division administrator, (4) consumer services division administrator and lobbyist, (5) personal property tax administrator, (6) budget and settlement division administrator, (7) estate tax administrator, (8) liaison to townships, and (9) administrative assistant to deputy county auditor. Based on this argument, and the factual dispute about the responsibilities of the jobs both as these responsibilities were constituted under the plaintiffs, and as they were envisioned by incoming County Auditor Testa, Testa contends he is entitled to qualified immunity.
 
 
 62
 We can easily dispense with Testa's argument that uncertainty about the facts relevant to where to place the employment positions at issue with respect to Branti leads to the conclusion that he is entitled to qualified immunity. Testa is entitled to qualified immunity only if the law is unclear, not the facts. More importantly, as we have said, to the extent Testa successfully argues the facts are unclear, he diminishes the extent of our jurisdiction under Johnson. The only significance of a lack of factual clarity would be that Testa's claim of qualified immunity may not be resolvable until after trial, at which time it may even merge into a determination on the merits of the plaintiffs' constitutional claim.
 
 
 63
 Testa's argument that the law with respect to the positions at issue here is unclear is more difficult to rebut, however. There can be no doubt about the essence of the rough distinction that the Supreme Court was trying to create in the Elrod-Branti-Rutan trilogy of cases: "grunt"[29] or "line" workers are entitled to First Amendment protection, but workers analogous to a cabinet secretary to a chief executive, along with the confidential advisors and administrative assistants of such executives and cabinet secretaries, are not entitled to First Amendment protection. See Juarbe-Angueira v. Arias, 831 F.2d 11, 13 (1st Cir.) (Breyer, J.) (distinguishing between category of positions that are mere "jobs for the boys" and positions for which a political broom should be allowed to make a clean sweep), cert. denied, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). Between the category of "line" or "grunt" workers and cabinet secretaries lies a vast range of positions. Some of these are entitled to First Amendment protection and others are not. For instance, it is obvious that, even though the Supreme Court decided in Rutan only that public garage workers were entitled to First Amendment protection, mechanics working in the same garage would also have been entitled to First Amendment protection. Before a government defendant in an interlocutory appeal case such as this can argue that legal haziness triggers qualified immunity, it must be factually undisputed that the employee in question is not what we refer to here, for lack of a better term, as a "grunt" worker.
 
 
 64
 We reject the notion that there must be a separate patronage dismissal decision by the Supreme Court or the Sixth Circuit involving a particular position before qualified immunity can be denied in such a case. The lack of specific precedent holding that a particular position is outside the Branti exception is a necessary condition to arguing that the First Amendment right to be free from patronage dismissal is unclear as to a particular position, but the lack of such precedent is not a sufficient condition for concluding that the law is unclear on the subject and so qualified immunity must be granted to a defendant. As the Supreme Court has cautioned when considering its difficult qualified immunity jurisprudence, "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously be held unlawful...." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. Testa's argument must fail. It simply cannot be true that there must be a specific patronage dismissal case in the Supreme Court or Sixth Circuit before qualified immunity can be denied to any otherwise eligible defendant in such a case. If this were true, qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual governmental actor in patronage cases because the reported case law classifies new positions very slowly.
 
 
 65
 Perhaps the best support for Testa's argument that the lack of particular precedent on point establishing that a job falls into or outside of the Branti exception mandates that he be granted qualified immunity, however, is dicta in Mumford: " '[I]dentifying generic categories of positions where partisan selection and rejection are permissible has ... proven to be an elusive and intractable task.' " Mumford, 4 F.3d at 434 (quoting Hawkins v. Steingut, 829 F.2d 317, 320 (2d Cir.1987) (citing Jimenez Fuentes, 807 F.2d at 241)). With all due respect to the First and Second Circuits, and the dicta in Mumford, we believe that certain categories of positions falling into the Branti exception can be specified with reasonable certainty. We set these categories out below so that the district courts may apply them in future patronage cases, especially those involving issues of qualified immunity:
 
 
 66
 Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted[30];
 
 
 67
 Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions[31];
 
 
 68
 Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors[32];
 
 
 69
 Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies[33].
 
 
 70
 In connection with using these categories, we note that if there is any ambiguity about whether a particular position falls into any of them (and so also within the Branti exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law per the Rice canon. Rice, 14 F.3d at 1140.
 
 
 71
 Below we give examples of positions falling into the four categories set out above. These examples are only meant to be illustrative:
 
 
 72
 Category One: a secretary of state given statutory authority over various state corporation law policies;
 
 
 73
 Category Two: a deputy secretary of labor in a state, to whom the secretary of labor has delegated the responsibility for crafting the department's annual proposed legislative agenda;
 
 
 74
 Category Three: a judge's law clerk or secretary;Category Four: a gubernatorially-appointed Democratic economist placed on a revenue forecasting committee consisting by law of two economists (one Republican and one Democrat) chosen by the state legislature, two economists of similar party affiliation chosen by the governor, and one economist of any party chosen by the president of the state's most prominent university.
 
 
 75
 Mumford 's dicta does not prevent us from delineating the preceding categories, because in Mumford there was no factual dispute about the actual duties of the court referee in that case, and, given that the court referee was the state equivalent of a federal magistrate judge, it was apparent to the Mumford court what the functions of the referee were. The decision in Mumford therefore does not depend on rejecting a categorical approach to defining the Branti exception.[34]
 
 
 76
 The Supreme Court's recent decision in O'Hare, which extends First Amendment protection to governmental contractors, also does not affect our delineation of the preceding Branti-exception categories because these categories could be applied to analyze any job contracted out to private parties in the same manner as we intend for these categories to be applied to jobs performed directly by government employees.
 
 
 77
 Most of the positions at issue in this case involve what appear to be governmental middle-managers. They are thus potential candidates for inclusion in category two. (Yet, there is nothing to prevent the state of Ohio or Franklin County from having granted to these positions discretionary authority in a law or ordinance, thus placing them in category one.) Three of the positions--staff attorney, part-time lobbyist, and township liaison--are potentially includable in category three. But these suggestions are only speculative. Unlike the position of the mayor's secretary in Faughender, for instance, or the assistant prosecutors in Marlinga, it is difficult for us to know exactly what any of the plaintiffs' positions entail, either as they inherently exist, as Testa allegedly envisions them, or as the plaintiffs performed them, without engaging in fact-finding and/or detailed research into state law. We must point out that both the plaintiffs and the defendant rarely cited to us any relevant state or county law that defines the responsibilities of the positions at issue. Indeed, Testa may not be able to do so, without undermining his own argument that the plaintiffs' positions are indefinite enough that he may safely redefine them without running afoul of state law. We recognize that this court stated in Faughender that in determining whether a particular position falls into the Branti exception the focus must be on the inherent functions of the position. Faughender, 927 F.2d at 913. Faughender was not a qualified immunity case, however, and in the situation where the inherent duties of the plaintiffs' positions are not apparent and the facts are not yet fully developed, it is not possible for us to decide, when reviewing in an interlocutory posture the denial of a motion for summary judgment, whether a defendant should be granted qualified immunity with respect to those positions. Having been provided no citations to state or county law delimiting the duties of the plaintiffs' positions here, and in the face of factual disputes about the nature of the plaintiffs' positions as a matter of patterns or practices, we must conclude that uncertainty about where on the Branti continuum between a "grunt" worker and a cabinet secretary to place the plaintiffs' positions in this case stems from obscurities in the facts, not the law.[35]
 
 
 78
 It will frequently be possible to find that a governmental defendant who takes an adverse action against a public employee is entitled to qualified immunity because it will be undisputed that the position falls into the category of positions akin to cabinet secretaries, or akin to confidential assistants to cabinet secretaries. When, however, a governmental employee may be nothing more than a supervisor with a glorified title who is simply performing functions over which he or she has no discretion, or no discretion of political significance, then this court cannot grant qualified immunity to a governmental defendant with respect to adverse employment actions taken against such lower-level public employees in an interlocutory appeal such as this. In these circumstances, resolution of the qualified immunity issue will need to await further proceedings.[36]
 
 
 79
 In Kennedy v. City of Cleveland, 797 F.2d 297, 299-300 (6th Cir.1986), cert. denied sub nom. Hanton v. Kennedy, 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), the court decided that in cases ultimately proceeding to trial, at least two interlocutory appeals could be taken of orders denying qualified immunity to § 1983 defendants--one appeal at the Fed.R.Civ.P. 12(b)(6) stage and another at the Fed.R.Civ.P. 56 or summary judgment stage. Recently, our ruling in this case was implicitly affirmed by the Supreme Court in Behrens, --- U.S. at ----, 116 S.Ct. at 839, a Bivens suit where the Court reversed a "one appeal" rule that had been adopted by the Ninth Circuit. Following up on Kennedy, our court held in Sinclair v. Schriber, 834 F.2d 103, 104-05 (6th Cir.1987), that it lacked interlocutory jurisdiction to address the denial of a motion for summary judgment on grounds of qualified immunity when the district court stated that, "[d]efendants should renotice their motion for summary judgment shortly after the conclusion of discovery, if they continue to believe they are entitled to such relief in light of the information disclosed." The Sinclair court reasoned that this result was compelled because the issue of qualified immunity remained "open, unfinished, or inconclusive" within the meaning of Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). "Kennedy ... permitted two bites out of the appellate apple ... [but] it did not contemplate that ... plaintiffs might be subjected to an endless number of appeals before trial." Sinclair, 834 F.2d at 105.
 
 
 80
 We believe that the instant case is distinguishable from Sinclair because the district court here did not deny Testa's motion for summary judgment in such an open-ended fashion. Even if Sinclair were not distinguishable, however, we would leave open the possibility of a subsequent summary judgment motion on grounds of qualified immunity by Testa. Behrens makes it clear that the Supreme Court literally meant what it said when it held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817. See Behrens, --- U.S. at ----, 116 S.Ct. at 839. See also Sinclair, 834 F.2d at 108 (Nelson, J., dissenting) ("the denial of a defendant's motion for summary judgment on the ground of qualified immunity 'easily' meets the requirement for appealability addressed in Cohen "). The Sinclair court's concern to avoid successive interlocutory appeals of renewed motions for summary judgment on the ground of qualified immunity can be accommodated without creating a blanket rule that prevents the consideration of such motions under all circumstances. The Ninth Circuit in Behrens had created a "one interlocutory appeal" rule for denials of motions for summary judgment, grounded partly in a similar concern. Behrens rejected the Ninth Circuit's reasoning, stating "if and when abuse does occur ... 'it is well within the supervisory powers of the courts of appeals to establish summary procedures and calendars to weed out frivolous claims.' " Behrens, --- U.S. at ----, 116 S.Ct. at 841 (quoting Abney v. United States, 431 U.S. 651, 662 n. 8, 97 S.Ct. 2034, 2042 n. 8, 52 L.Ed.2d 651 (1977)). In this case, with further legal development on the question of the plaintiffs' job responsibilities under state and county law and to a lesser extent further factual clarification, we do not necessarily think that another motion for summary judgment on grounds would be abusive. Of course, with enough legal and factual development, the issue of qualified immunity tends to merge with the merits of the plaintiffs' claim, possibly obviating the need for the district court to make additional rulings on the issue of qualified immunity in the future.
 
 
 81
 On the basis of the categorical analysis set forth above, we can quickly conclude that it would be improper to reverse the district court's denial of qualified immunity to Testa with respect to the positions of Huber (real estate division administrator), Devore (automated mapping division administrator), Skaates (personal property tax division administrator)[37], Cohen (budget and settlement division administrator), and Morgan (estate tax administrator). Whether Testa is entitled to qualified immunity with respect to some, all, or none of these positions must await further proceedings. Deciding if Testa was properly denied summary judgment on grounds of qualified immunity with respect to the other four positions involved in this case is not as simply resolved, however.
 
 
 82
 Whether Testa is entitled to qualified immunity with respect to staff attorney McCloud depends on what McCloud's job entailed. Was McCloud's position more like that of the assistant public defenders in Branti, or more like the category three city attorney who functioned as an advisor in Williams[38], or more like the category one assistant prosecutor in Marlinga[39]? We cannot answer these questions on the basis of the barren record before us because neither the plaintiffs nor the defendant have cited to us any helpful state or county law. After trial, the facts about the practices, or analysis of the legal duties, of McCloud's position will establish whether his position is more like that in Branti or more like those in Williams or Marlinga. Or it may turn out that McCloud's position is not subsumed under the principles analyzed in any of these cases, and therefore, given the current state of the law's development in this area, the position should trigger qualified immunity for Testa. We are not holding that Testa should be denied qualified immunity with respect to McCloud's position; we are merely holding that we cannot answer this question with sufficient confidence, given uncertainties about the facts and the absence of any citations to state or county law, to reverse the district court's refusal to grant summary judgment on grounds of qualified immunity.
 
 
 83
 With respect to the position of Giammarco, consumer services division administrator and lobbyist, we would probably not hesitate to grant Testa qualified immunity if it were undisputed that Giammarco was the exclusive lobbyist for the County Auditor's office and that she spent most of her time in this capacity. Her position would thus fall into category three. However, we cannot say this is the case on the basis of the record in front of us. And we would certainly not be prepared to say that all "government relations personnel" per se would fall into the Branti exception. The federal government, for instance, has some agencies with large lobbying "shops" attached to them. The position of the chief lobbyist almost certainly falls into the Branti exception, but the vast majority of staff lobbyists may not. Cf. Stott v. Martin, 725 F.Supp. 1365, 1434 (E.D.N.C.1989) (holding that position of state assistant secretary of commerce who was chief lobbyist for department of commerce fell into Branti exception). Moreover, here, Giammarco was not solely a lobbyist, but also the consumer services division administrator. The district court will need to consider the extent and nature of Giammarco's lobbying activities in ultimately deciding whether Testa was entitled to qualified immunity with respect to her position. The district court should also consider whether it would have been feasible for Testa to have taken the less drastic option of simply terminating Giammarco's duties as County Auditor's office lobbyist, while allowing her to stay on as consumer services division administrator. For instance, Testa transferred the functions of Cohen's and Hysell's positions to other County Auditor's office employees. It may become evident after fuller factual development that Giammarco's lobbying role could have been easily shifted to another employee in the County Auditor's office, or it might turn out that Giammarco's lobbying and division administrative duties were practically inseparable. If Giammarco's roles were separable, Testa may have exceeded the scope of the Branti exception by terminating Giammarco completely, rather than seeing if it was feasible to keep her, performing only her constitutionally protected job function.
 
 
 84
 The analysis of Hysell's position as township liaison is similar. On the one hand, Hysell inventoried lock boxes for estate tax purposes--a function clearly not within any of the four categories we set out above comprising the Branti exception. On the other hand, Hysell was the township liaison who was the "point man" in the County Auditor's office for dealing with elected township officials. This function may fall into category three of the Branti exception. Just like Giammarco, Hysell wore two hats, and the district court will need to sort out on remand: (1) whether Hysell's function as a township liaison fell into the Branti exception; and, (2) if so, whether Testa exceeded the scope of his protection under Branti by terminating Hysell completely rather than simply terminating his functions as township liaison.
 
 
 85
 Finally, Tilson's position as administrative assistant to the category two Deputy County Auditor unquestionably places her within category three under Faughender. We have already held that the position of a mayor's secretary falls within the Branti exception. "As political action cannot occur without communication, a position that controls the lines of communication of a political actor must be inherently political." Faughender, 927 F.2d at 914. Both the plaintiffs and Testa agreed that Everhart's position as Deputy Auditor was a position for which political affiliation was an appropriate requirement, and hence Faughender requires that Testa receive qualified immunity in relation to his termination of Tilson.
 
 
 86
 To summarize: we affirm the district court's refusal to grant summary judgment on grounds of qualified immunity to Testa with respect to his dismissals of McCloud, Huber, Devore, Giammarco, Skaates, Cohen, Morgan and Hysell, despite Testa's argument that there is no law specifically locating any of their positions with respect to the Branti exception. Uncertainty about the actual duties of these positions, when their inherent nature is not apparent (no parties to this suit have cited any helpful state or county law defining the duties of the positions), precludes us from reversing the district court's determination. We emphasize that qualified immunity may become available to Testa with respect to any of these positions as the facts are crystallized or the relevant state/county law is developed before the district court at any time up to or including the conclusion of trial. Our current disposition of this case does not prevent the district court from granting qualified immunity to Testa with respect to any of these positions. The district court did err, however, in failing to recognize that Tilson's position as a secretary to the category two Deputy County Auditor, which the parties agreed was a position for which political affiliation was an appropriate requirement, fell into category three, because Tilson controlled the lines of communication to the Deputy County Auditor. Thus, Testa was entitled to qualified immunity with respect to his termination of Tilson.
 
 IV
 
 87
 The district court's order denying summary judgment on grounds of qualified immunity to Testa is AFFIRMED with respect to the positions of McCloud, Huber, Devore, Giammarco, Skaates, Cohen, Morgan, and Hysell. In ultimately determining whether Testa is entitled to qualified immunity with respect to these positions as the facts become clearer and the relevant law is researched, and in determining whether any of the plaintiffs' positions actually fall into the Branti exception, the district court is to take guidance from the analysis in this opinion, particularly in terms of the four categories established above. The district court's order denying summary judgment on grounds of qualified immunity to Testa with respect to Tilson's position is REVERSED, however. It is also the law of the case that Testa's argument that he is entitled to qualified immunity because the plaintiffs were affiliated with a non-ideological faction within the same political party has been rejected.
 
 
 
 *
 The Honorable Jennifer B. Coffman, United States District Judge for the Eastern and Western Districts of Kentucky, sitting by designation
 
 
 [1]
 Testa's notice of appeal indicates that he is appealing in both his official and individual capacities, but qualified immunity applies only to an official's liability in his individual capacity. Kentucky v. Graham, 473 U.S. 159, 167, 105 S.Ct. 3099, 3105-06, 87 L.Ed.2d 114 (1985). Therefore, Testa can be appealing the district court's order only insofar as it refused to grant him qualified immunity in his individual capacity
 
 
 [2]
 The Franklin County Auditor is the county's chief fiscal officer, its tax assessor, and its disbursement agent for all expenses and costs
 
 
 [3]
 The only evidence of the political ideologies of any of the parties to this suit comes from Plaintiff Elsa C. Giammarco. She indicated that she knew Joseph Testa opposed legalized abortion, but she did not state that she disagreed with Testa on this issue
 
 
 [4]
 The plaintiffs attempt to argue that Testa admitted that political affiliation has nothing to do with their job responsibilities. Testa admitted that political "activity " should not have anything to do with the plaintiffs' positions, but political activity and political affiliation are two different matters. In other words, the apparent contradiction between Testa's arguing that he dismissed the plaintiffs because they occupied policymaking or confidential positions and his agreement that political activity would be irrelevant to performance in those same positions can be reconciled by noting that a person could remain politically inactive or neutral and still do a good job in the positions. According to Testa, this does not mean, however, that political affiliation with an opponent of Testa's would not be an obstacle to satisfactory performance in such positions
 
 
 [5]
 Testa argues that he was ignorant of the party affiliation of Devore, Skaates, Cohen, and Morgan, but this fact, even if true, is irrelevant to this case, as the salient political affiliation is an affiliation either personally with McNeal, or more generally with the Tracy faction of the Franklin County Republican Party
 
 
 [6]
 Everhart was also fired by Testa, but decided not to contest his dismissal, perhaps because he recognized that his political affiliation would have been held to be an appropriate requirement for the performance of his job as Chief Deputy Auditor
 
 
 [7]
 See Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 629-30, 69 L.Ed. 1138 (1925) (holding that the Fourteenth Amendment's right to due process from the states incorporates the First Amendment's guarantees)
 
 
 [8]
 Rice had the effect of eliminating the basis for one criticism of Sixth Circuit First Amendment patronage jurisprudence. See Susan Lorde Martin, A Decade of Branti Decisions: A Government Official's Guide to Patronage Dismissals, 39 Am. U.L.Rev. 11, 35 (1989) ("The Sixth Circuit has issued no opinions clearly indicating whether it interprets the Elrod /Branti protection broadly or narrowly, or the particular test it would use to determine protected status.") One of the effects of Rice was to establish this particular test that had previously been missing in our circuit
 
 
 [9]
 In his dissent from two very recent Supreme Court decisions, Justice Scalia has argued that the application of strict scrutiny in the patronage context has been overturned by one of those cases. See Board of County Commr's, Wabaunsee County, Kan. v. Umbehr, --- U.S. ----, ----, 116 S.Ct. 2361, 2369, 135 L.Ed.2d 843 (1996) (Scalia, J., dissenting) (dissenting from the Court's decisions in Umbehr and O'Hare Truck Serv., Inc. v. City of Northlake, --- U.S. ----, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996); arguing that Umbehr overturned the application of strict scrutiny). However, Umbehr was a case decided in the Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), line of cases, not the patronage line of cases. The former protects freedom of belief for public workers, and the latter freedom of speech for public workers. As O'Hare points out, these two lines of cases invoke different legal standards. Pickering 's balancing test has never been applied in the patronage setting. Thus, Umbehr should not be read to overrule the Supreme Court's application of strict scrutiny to patronage. The dispute between Justice Scalia and the Court on this point, however, is irrelevant for our purposes because, as will be explained later, each patronage case brought in a lower federal court does not call for the application of strict scrutiny. The Supreme Court has already applied strict scrutiny to patronage as a class of practices and decided that patronage can be justified in particular cases only if political affiliation is an appropriate job requirement
 
 
 [10]
 As discussed below, we cannot say with certainty that the Rice canon will have any effect on this case because the parties have not cited to us the state law that would enable us to determine how the Ohio legislature or Franklin County legislative body has classified the plaintiffs' jobs. When the district court takes this case up on remand, one of its tasks will be to determine whether the Rice canon applies to this case
 
 
 [11]
 We note, however, that Brennan did not address the Supreme Court's opinion in Johnson. In fact, the heart of the Brennan court's analysis was that the district court had made "an erroneous factual assumption." Brennan, 78 F.3d at 1153. Thus, there may be some conflict between Brennan and Johnson. Johnson also suggests that the Supreme Court disfavors exercises of pendent appellate jurisdiction. "Even assuming, for the sake of argument, that it may sometimes be appropriate to exercise 'pendent appellate jurisdiction' over such a matter, but cf. Swint v. Chambers County Comm'n, 514 U.S. 35, ---- - ----, 115 S.Ct. 1203, 1211-12, 131 L.Ed.2d 60, it seems unlikely that Courts of Appeals would do so in a case where the appealable issue appears simply a means to lead the court to review the underlying factual matter...." Johnson, 515 U.S. at ----, 115 S.Ct. at 2159
 
 
 [12]
 Testa does argue that our scope of review is not limited to consideration of the issue of qualified immunity alone, citing Carlson v. Conklin, 813 F.2d 769, 770-71 (6th Cir.1987) ("We need not confine our review, however, to the viability of the qualified immunity defense."), citing Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232-33, 85 L.Ed. 189 (1940) ("If insuperable objection to maintaining the bill clearly appears, it may be dismissed and the litigation terminated.") (quoting Meccano, Ltd. v. Wanamaker, 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822 (1920)). While the language of Carlson is often used in our qualified immunity cases, it is much broader than necessary to express the point intended--broad enough to suggest that in these cases the Sixth Circuit had adopted pendent appellate jurisdiction in qualified immunity interlocutory appeals. This is not what cases like Carlson stand for. Despite the frequently used and expansive language summarizing its holding, Conklin merely stands for the proposition that the only other issue this court may consider in reviewing qualified immunity interlocutory appeals is whether the plaintiffs have stated a claim for a violation of § 1983 under Fed. R. Civ. 12(b)(6). See 16 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, Federal Practice and Procedure § 3921, at 17-19 (1977) (discussing Deckert rule). While there are many cases citing the broad language used in Conklin, we have been unable to locate any cases that applied Conklin for any purpose other than ruling against § 1983 plaintiffs on Rule 12(b)(6) grounds
 
 
 [13]
 The force of this argument is not diminished by the fact that we ultimately decide that Testa is not entitled to prevail as to the majority of plaintiffs' employment positions in this case. Future governmental defendants who are denied qualified immunity because of the existence of a factual dispute will no doubt benefit from a rule that still gives them the right to appeal such a determination when they have sufficient grounds to claim an entitlement to qualified immunity as a matter of law
 
 
 [14]
 In O'Hare, --- U.S. at ----, 116 S.Ct. at 2358, the Supreme Court extended First Amendment protection from patronage to government contractors. After doing so, the Court remanded that case, however, where it was unclear whether the plaintiffs were alleging that they had been denied government contracts because of their political persuasion, because of political speech they had engaged in, or both. "A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the Pickering context, are intermixed with a political affiliation requirement. In those cases, the balancing Pickering mandates will be inevitable." Ibid. But see O'Hare, --- U.S. at ---- - ----, 116 S.Ct. at 2370-72 (Scalia, J., dissenting) (questioning the Court's conclusion that in cases where patronage and Pickering free speech claims are "intermixed," the easier Pickering, rather than the harder patronage, standard should be applied). There is no need for us to apply Pickering in this case because the plaintiffs do not allege that they were terminated, even only in part, for engaging in political speech, but that they were terminated solely because of their political affiliation
 
 
 [15]
 After briefing and oral argument in this case had concluded, the Supreme Court decided O'Hare, which extended First Amendment protection to government contractors, creating a "big four" group of patronage decisions. We cite O'Hare to buttress some of our conclusions, but do not rely on it in determining what patronage law was clearly established
 
 
 [16]
 Testa argues that the Williams dictum suggests that a court in a patronage case must find not only differences of political party affiliation, but also differences in the commonality of political support and association. Of course, the correct reading of the Williams dictum is that both categories are entitled to the protection of the First Amendment
 
 
 [17]
 We cite Crumbley, Picha, and Neice, all unpublished opinions, not for authority on contested, novel issues of law, but only to show that our conclusion that the First Amendment ban applies to non-ideological factions is relatively uncontroversial and has been assumed in many cases
 
 
 [18]
 Contrast the majority opinion in Anderson with then-Justice Rehnquist's dissent. Justice Rehnquist pointed out to no avail that presidential candidate Anderson was a disgruntled Republican who became an independent only because he "realiz[ed] that he had no chance for the Republican nomination." Anderson, 460 U.S. at 811, 103 S.Ct. at 1581-82 (Rehnquist, J., dissenting). Moreover, his Anderson dissent also cited Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), which upheld a California statute prohibiting an independent candidate from affiliating with a political party for 12 months preceding the primary election against a First Amendment challenge: "[This disaffiliation statute] works against independent candidates prompted by short-range political goals, pique, or personal quarrel. A state need not take the course California has, but California apparently believes with the Founding Fathers that splintered parties and unrestrained factionalism may do significant damage to the fabric of government. See The Federalist No. 10 (Madison)." Anderson, 460 U.S. at 813, 103 S.Ct. at 1582 (Rehnquist, J., dissenting) (quoting Storer, 415 U.S. at 735-36, 94 S.Ct. at 1281-82). As Justice Rehnquist pointed out, Anderson does not leave very much of the Storer rationale intact. Here, we can safely apply this lesson and conclude that neither does Anderson leave very much of the argument that non-ideological factions formed out of "pique" and "personal quarrel" should receive a different level of First Amendment protection
 
 
 [19]
 However, as Justice Scalia points out in his dissent in Rutan, the "right-privilege" distinction is not entirely defunct. Rutan, 497 U.S. at 97 n. 2, 110 S.Ct. at 2749 n. 2 (Scalia, J., dissenting). The Supreme Court recently affirmed in Waters v. Churchill, 511 U.S. 661, ----, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686 (1994) (plurality), that the government may impose some conditions in its capacity as an employer that it may not impose in its capacity as sovereign. The concurring opinions authored by Justices Souter and Scalia did not take issue with the plurality's position in this regard
 
 
 [20]
 A collective action problem occurs when an individual has an incentive to "free-ride" on the efforts of others. For instance, in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977), the Supreme Court upheld under antitrust rule of reason analysis a manufacturer's policy of territorial restraints on its retailers, because without these restraints a retailer who provided minimal point-of-sale services could "free-ride" on those retailers who provided more lavish point-of-sale services
 
 
 [21]
 Negative externalities occur when the private costs of some activity are less than the total costs to society of that activity. As a result, society produces more of the activity than is optimal because private parties engaging in that activity essentially shift some of their costs onto society as a whole. See Brae Corp. v. United States, 740 F.2d 1023, 1056-57 (D.C.Cir.1984) (per curiam) (striking down ICC's regulation that permitted boxcar owners and carriers to escape other ICC regulations if they entered into bilateral boxcar hiring contracts, because absent any externalities, boxcar owners would enter into such agreements without the incentives provided by the stricken regulation), cert. denied sub nom. ICC v. Brae Corp., 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Justice Stevens's concurrence in Rutan essentially argues that Justice Scalia's dissent ignores the existence of externalities: "[Justice Scalia's] defense of patronage obfuscates the critical distinction between partisan interest and the public interest." Rutan, 497 U.S. at 88, 110 S.Ct. at 2744 (Stevens, J., concurring)
 
 
 [22]
 The following lists include positions that were explicitly held to fall outside of the Branti exception and positions that were simply assumed to fall outside of the Branti exception
 
 
 [23]
 Elrod also noted that one of the plaintiffs in that case whose position was neither policymaking nor confidential was a generic "employee" of the sheriff's office. Presumably this employee was an administrative worker of some sort. That the Supreme Court saw fit in its opinion not to give this employee's title or job functions helps to make the point that it can be clearly established that categories of positions, instead of only particular positions, are entitled to First Amendment protection
 
 
 [24]
 The Rutan Court extended Elrod /Branti to apply to all adverse employment actions, not simply terminations. The rehabilitation counselor and road equipment operator in Rutan alleged that they were denied promotions. In terms of the Branti exception, it is the positions to which they were denied promotions that in a strict sense are relevant, not the positions which they occupied. Nevertheless, the Court did not indicate what these positions were. Obviously it cannot be said that it has been clearly established that these unnamed positions are entitled to First Amendment protection. However, it probably can be said that it is clearly established that the positions they occupied are entitled to First Amendment protection. If a position higher up the hierarchy is protected by the First Amendment, it must be true that most positions beneath it on the hierarchy are also protected. We are prevented from making the preceding syllogism absolute, however, by the fact that secretaries' (administrative assistants') positions become unprotected positions even though they are usually relatively low on the hierarchy when they control the lines of communication to other unprotected positions high in the hierarchy
 Also, Rutan does not technically hold that the positions it discussed fell outside of the Branti exception, because the governmental defendants conceded that the five plaintiffs in that case were not within the Branti exception. Rutan, 497 U.S. at 71 n. 5, 110 S.Ct. at 2735 n. 5; Rice, 14 F.3d at 1140.
 
 
 [25]
 The Supreme Court recently added an eighth position, that of tow truck operator, in O'Hare, --- U.S. at ----, 116 S.Ct. at 2356. While this case obviously cannot be used to fix what patronage law was clearly established in a narrow sense at the time Testa fired the plaintiffs, because the case was decided after that time, it remains helpful, as we discuss below, in demonstrating that some categories of jobs are so obviously protected from patronage by the First Amendment that the law is clearly established with respect to these categories of jobs even if there are no cases already specifically addressing whether political affiliation is appropriate to those jobs
 
 
 [26]
 Balogh did not address the holding of a plurality of the Supreme Court in Elrod that the bailiff in that case was neither a policymaking nor a confidential employee
 
 
 [27]
 Picha does not make clear the exact nature of the inspection duties of the terminated worker--whether he was, for instance, a building inspector, a fire inspector, or both. The case was remanded and the appeal after remand was considered in Picha v. City of Parma, 28 F.3d 1214, 1994 WL 369135 (6th Cir.1994) (unpublished per curiam) [hereinafter Picha II ]. In Picha II, the court reversed the district court's grant to the defendant mayor of judgment as a matter of law, effectively reinstating the jury's finding that the mayor had terminated the plaintiff because of his political affiliation
 
 
 [28]
 We recognize that our citation to unpublished cases, especially in the qualified immunity context, where the key inquiry is whether a principle of law is clearly established, may be perceived as problematic. However, the use made of such cases here is appropriate for two important reasons. First, cases the court properly decides not to designate for publication should generally be uncontroversial and establish no new precedent. The unpublished cases we cite only serve as real-life examples to demonstrate that some job positions can be situated with relative ease in relation to the Branti exception. This reinforces the point we make below at greater length that, in many cases, there need not be an opinion specifically addressing the job position at issue in a particular case before it is possible to conclude that this position is clearly within or outside of the Branti exception. Second, in making this point about the interplay of the Branti exception and qualified immunity, we offer a number of examples below about jobs that can be clearly positioned in relation to the Branti exception. These citations to unpublished cases can be considered as having only the same persuasive force as the hypothetical examples we have devised. We think, however, that unpublished opinions, because they show how our court dealt with concrete disputes, are more persuasive than the purely hypothetical examples we have invented and so merit consideration
 
 
 [29]
 A popular dictionary defines "grunt" as a slang term meaning "a common or unskilled worker; laborer." Random House Dictionary of the English Language 846 (2d ed.1987). By using this term, of course, we do not mean to imply that the plaintiffs in this case are unskilled or, even more generally, that the only public employees entitled to First Amendment protection are those who are unskilled. Although, of course, unskilled public workers would almost certainly fall outside of the Branti exception and therefore be entitled to First Amendment protection
 
 
 [30]
 Category one captures the intuition gained from reading Elrod, Branti, and Rutan that a chief executive's cabinet secretaries and similar employees fall into the Branti exception. The proviso that the policymaking authority possessed by a category one position-holder must be held in relation to a matter of political concern stems from the discussion in Branti that a football coach is a policymaker, but not the sort of policymaker for whom political affiliation is an appropriate requirement under the First Amendment. See Branti, 445 U.S. at 518, 100 S.Ct. at 1294
 
 
 [31]
 Category two is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy. Category two also exists to capture those who would otherwise be category one policymakers, except that the federal government, state, county, or municipality has chosen for whatever reason not to set out the responsibilities of such a position in a statute, ordinance, or regulation
 
 
 [32]
 Category three is formulated to comport with the discussion in Branti indicating that a state governor may "believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." Branti, 445 U.S. at 518, 100 S.Ct. at 1294. This category also includes those who control the lines of communication to category one or category two position-holders per Faughender, 927 F.2d at 914
 
 
 [33]
 Category four is formulated to accommodate the example given in Branti that an election judge could be dismissed without violating the First Amendment where state law requires that one election judge be a Democrat and the other a Republican. Branti, 445 U.S. at 518, 100 S.Ct. at 1294
 
 
 [34]
 In the typology we set forth above, Mumford is a category two case, because it involved a court referee who was delegated a significant portion of the policymaking power of a judge by that judge, a category one position-holder. See Newman v. Voinovich, 986 F.2d 159, 164 (6th Cir.) (Jones, J., concurring) (pointing out that a judge appointed by a governor is a policymaker, even if not a policymaker for the governor), cert. denied, 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993)
 
 
 [35]
 It is entirely possible that no state or county law exists that would be helpful in deciding this appeal. If this is the case, we have identified a class of circumstances where granting summary judgment to § 1983 First Amendment patronage defendants claiming qualified immunity will be almost impossible. The best support for this conclusion is Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which holds that because there is no respondeat superior liability for § 1983 actions, in order to make a subdivision of a state liable for the actions of its subordinates, the unlawful actions of the individual decisionmaker(s) must be shown to be the official policy of the state's subdivision. Sometimes this can be done with reference to state or municipal law setting out the authority inherent in the decisionmaker's position. In cases where no such law exists, or where it is being ignored, however, resort must be had to evidence of a pattern or practice that might indicate that the decisionmaker had policymaking authority. Applying the learning of Monell in this context, we note that conclusively establishing the duties of a particular position by offering pattern or practice evidence will typically be very difficult to do at the summary judgment stage. The existence of patterns or practices are rarely undisputed matters
 
 
 [36]
 Baker v. Hadley, 72 F.3d 129, 1995 WL 717029 (6th Cir.1995) (unpublished per curiam), may take a different view of the proper disposition of an interlocutory appeal such as this. In Baker, the panel reversed and remanded a denial of summary judgment on grounds of qualified immunity because there was a factual dispute about the nature of the plaintiffs' positions. (Ironically, the plaintiffs were also terminated by a Republican County Auditor in Ohio.) The Baker court's reasoning is unclear, but the court seems to have been concerned that the district judge did not consider whether the law was clearly established at the proper level of generality with respect to the plaintiffs' positions. We will not presume that the district judge in this case engaged in a faulty review of Testa's qualified immunity claim, however. And to the extent that Baker suggests that an individual case must exist holding that the particular positions at issue in a case fall outside the Branti exception in order to deny a defendant qualified immunity, we are not bound to follow Baker because it is an unpublished case
 
 
 [37]
 Based on a rare citation to state law defining the duties and responsibilities of the workers in this case, Testa argues that Skaates's position is "confidential" because Skaates has a duty under Ohio law (Ohio Rev.Code Ann. § 319.34 (Baldwin 1996)) to keep tax return information confidential. This is not the kind of "confidentiality" required by Branti exception analysis. A key-punch operator working for the County Auditor's office would have a similar obligation under Ohio law, but it is obvious that such a worker would not fall into the Branti exception. A worker must be privy to political or policymaking decisions
 
 
 [38]
 "The duties inherent in the position of the City Attorney indicate that a relationship of confidence and trust between the City Attorney and the Mayor and Council is necessary to the effective performance of the job. Thus, under Branti, the City Attorney does not enjoy first amendment protection against politically-motivated dismissal." Williams, 909 F.2d at 155
 
 
 [39]
 "Because Michigan law statutorily imposes the inherent policy-making responsibilities of the prosecutor on the assistant prosecutor, we hold that the job of assistant prosecutor is a policy-making position." Marlinga, 923 F.2d at 426