CLAY, Circuit Judge,
dissenting.
I respectfully dissent. Tennessee law concerning the position of county election administrator, in my view, compels a conclusion that the position is not one for which political loyalty is an appropriate requirement. First, county election administrators serve multi-member commissions that, by statutory design, include members of both the majority and the minority political parties. Second, contrary to the majority, I conclude that the duties assigned to the county administrators by statute do not involve significant policymaking discretion, and that the position is not otherwise suited to classification as category two under the McCloud framework. McCloud v. Testa, 97 F.3d 1536, 1557 (6th Cir.1996). Third, because the administrator is not in a confidential relationship with the county election commis *351 sion, nor would such a relationship be appropriate in light of Tennessee’s open meeting laws, I do not agree with the majority’s alternative holding that Plaintiffs were subject to patronage dismissal as category three employees under the McCloud framework.
I.
The majority takes as its point of departure the apparent agreement of the parties that the position of county election commissioner falls within category one of the McCloud scheme. Maj. Op. at 343. This classification appears to be inescapably flawed, and the majority errs by uncritically relying on the parties’ stipulation on this point of law. Neuens v. City of Columbus, 303 F.3d 667, 670 (6th Cir.2002) (“ ‘Parties may not stipulate to the legal conclusions to be reached by the court.’ ”) (quoting TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir.1995)).
Under McCloud, category one comprises positions named by law “to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted.” 97 F.3d at 1557. Under Tennessee law, county election commissioners do not enjoy discretion or policymaking authority sufficiently robust to meet this test. For a century, the Tennessee Supreme Court has repeatedly held that the authority of county election commissions is ministerial, rather than discretionary, in nature.[1] City of Memphis v. Shelby Cnty. Election Comm’n, 146 S.W.3d 531, 535 (Tenn.2004) (“as ministerial officers, the [County Election] Commission and the [State Election] Coordinator have limited discretion.”); Shelby Cnty. Election Comm’n v. Turner, 755 S.W.2d 774, 776 (Tenn.1988) (“[T]he Election Commission has only ministerial duties.”); Peeler v. State ex rel. Beasley, 190 Tenn. 615, 231 S.W.2d 321, 323 (1950) (holding that the duties of county election commissions are ministerial); Curtis v. State, 163 Tenn. 220, 43 S.W.2d 391 (1931); Taylor v. Carr, 125 Tenn. 235, 141 S.W. 745, 750 (1911) (“The duties of the commissioners of election are only ministerial”); see State ex rel. Tidwell v. Morrison, 152 Tenn. 59, 274 S.W. 551, 552 (1924).
Nor does an examination of their statutory duties support a conclusion that Tennessee county election commissions enjoy a significant degree of “discretionary authority with respect to ... [some] policy of political concern.” McCloud, 97 F.3d at 1557 (defining category one). These duties are in large part detailed and mandatory, comprising tasks such as certifying and canvassing voting machines, certifying election results, sealing absentee ballot boxes, and keeping minutes of all commission meetings. Tenn.Code Ann. § 2-12-116(6), (8), (11), (12). Even in the performance of duties that arguably entail some degree of discretion, such as purchasing voting machines or hiring an election administrator, the commission must adhere to detailed standards spelled out in statute or regulation. See, e.g., Tenn.Code Ann. §§ 2-9-101, 29-110, 2-9-117 (setting *352 detailed specifications for voting machines; requiring non-standard machines to conform with the rules of state election coordinator; requiring approval of the state coordinator of elections and state election commission prior to purchase as well as periodic review by these authorities to ensure that the machines “meet the minimum criteria for certification”); Tenn. Code Ann. § 2-11-16(1) (requiring the commission to consider a candidate’s competencies in nine subject areas in appointing an administrator). In short, it does not appear that the commissions exercise meaningful discretion “on issues where there is room for principled disagreement on the goals or their implementations.” See Rice v. Ohio Dept. of Transp., 14 F.3d 1133, 1142 n. 9 (6th Cir.1994) (quoting Nekolny v. Painter, 653 F.2d 1164, 1170 (7th Cir.1981)).
If the discretionary authority of the commission is narrow, the discretion enjoyed by any single county election commissioner with regard to these duties is necessarily even more limited, with the added hurdle of obtaining the concurrence of at least two other commissioners to act as a majority. Indeed, McCloud’s category one is a poor fit for a multi-member public body, particularly one that, by statute, is composed of appointees representing both the majority and the minority parties. Tenn.Code Ann. § 2-12-103(a). If the majority opinion is to be believed, the commissioners representing the minority in fact have no discretionary authority at all, because “complete practical control” has been granted to commissioners from the majority party. Maj. Op. at 349.
Instead, commissioners are more appropriately classified as category four officials under McCloud. That category covers “positions that are part of a group of positions filled by balancing out political party representation.” McCloud, 97 F.3d at 1557. As this Court explained in McCloud, this fourth category was “formulated to accommodate the example given in Branti that an election judge could be dismissed without violating the First Amendment where state law requires that one election judge be a Democrat and the other a Republican” — a pertinent example for this case. Id. at 1557, n. 33 (citing Branti, 445 U.S. at 518, 100 S.Ct. 1287). Although the majority interprets Tennessee’s statutory system as designed to give control to the majority party, the same statutory framework just as plainly requires representation of the minority party. Moreover, an intention to moderate majority control with some amount of balance between the parties is reflected in § 2-12-105, which requires each county election commission to select a chair and a secretary of opposing parties.
The proper categorization of county election commissioners is not a matter of idle interest. The majority relies substantially on the relationship between the administrator and the commission, emphasizing that numerous duties of the commission are delegated to the administrator and that the commission in many instances acts on the recommendation of the administrator. Maj. Op. at 346 (citing Summe, 604 F.3d at 266 (“the position is one to which a significant amount of the total discretionary authority available to category-one employees has been delegated.”)). But the parties’ agreement that commissioners are category one officials cannot create discretion on issues of political importance where the discretion does not otherwise exist.
I do, however, agree that the relationship between the administrator and the commissioners is important in determining whether the position falls within the Elrod-Branti exception to First Amendment protection against dismissal based on per *353 ceived political affiliation. As the Supreme Court has explained, the “ultimate inquiry” in a patronage dismissal case is “whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 517-18, 100 S.Ct. 1287 (emphasis added). Only in these circumstances is the state interest compelling enough to justify infringing First Amendment rights. Rutan v. Republican Party of Ill., 497 U.S. 62, 71 n. 5, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). See also McCloud, 97 F.3d at 1543. Here, the administrator serves a commission that, by explicit statutory design, includes commissioners affiliated with both the majority and the minority political parties. This fact, it seems to me, argues powerfully for the conclusion that it would be inappropriate to select the administrator based on political affiliation with one of those parties.
II.
Directly analyzing the statutory duties of the administrator leaves me still unable to agree with the majority that the position may be appropriately classified as category two under the McCloud framework. The bulk of the administrator’s duties are ministerial and administrative in nature, covering such matters as purchasing supplies, maintaining voter registration files and campaign disclosure records, providing for the instruction of poll workers, and maintaining fiscal records. § 2-12-201(a).
The majority heavily emphasizes the administrator’s role in assisting with apportionment and redistricting processes, as well as the administrator’s responsibility to set precinct locations, precinct boundaries, and early voting sites. As to apportionment and redistricting, the administrator’s role should not be overstated: the relevant voting boundary lines are proposed and drawn by the General Assembly or by the legislative bodies of other pertinent units of government. See Tenn. Const., Art. II, § 4; Tenn.Code Ann. §§ 3-1-102, 3-1-103 (general assembly shall set state senatorial and representative districts); Tenn. Const., Art. VII, § 1; Tenn.Code Ann. § 5-1-111 (county legislative bodies shall reapportion their districts every ten years). The political considerations of drawing electoral boundaries — considerations that are of course subject to constitutional limits — are primarily and significantly the responsibility of the political bodies drawing those boundaries. It bears remembering that some of the local governmental units turning to the administrator for assistance in the apportionment process may well be controlled by the party that is in the minority at the state level. It is therefore unsurprising that, as Plaintiffs attest in their affidavits, the role of county election administrators in this process is historically confined to supplying information regarding the number of eligible voters in relevant areas.
The administrators’ responsibility in developing plans regarding precinct boundaries'and the selection of polling places also falls short of vesting the position with material discretionary authority. The majority opinion does not articulate how these decisions concern issues allowing for principled disagreement on policy goals or implementation, but the brief of one set of Defendants is more forthcoming:
[I]f an election commission, by majority vote, wishes to make it more difficult for a certain voting block perceived as being in favor of the minority party to conveniently vote, they need only move the polls to a different location in the precinct where it is less convenient, or reduce the number of early voting sites.
Dennis et al. Defs.’ Br. at 25. Dirty tricks and voter suppression (whose consti *354 tutionality even where -protected classes are not at issue must seriously be doubted, see, e.g., Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986)) are emphatically not the kind of appropriate policy goals that can justify infringing on an individual’s First Amendment rights under the Elrod-Branti exception. The question, after all, is whether “party affiliation is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 518, 100 S.Ct. 1287 (emphasis added); see also id. at 517 n. 12, 100 S.Ct. 1287 (noting that the Elrod plurality “emphasized that patronage dismissals could be justified only if they advanced a governmental, rather than .a partisan, interest.”).
Nor do county election administrators’ budgetary responsibilities meaningfully support a category two designation. Plaintiffs’ affidavits regarding their responsibilities explain that they had “no discretionary authority” in performing this duty. (See, e.g., R. 250, Zeh'ner Affidavit.) As they explain, “A county election budget is simply a prediction of expense for the next fiscal year based upon experience from prior elections,” derived from objective inputs like the number of polling places. (Id.) The county election commission then must approve the budget,. of course subject to any amendment desired by a majority of the election commissioners, then submit it to the county governing body for approval. Administrators’ role in this process is not particularly significant, nor, in contrast to the plaintiff in Blair v. Meade, 76 F.3d 97, 100-101 (6th Cir.1996), do they directly advise those ultimately responsible for making the political decisions regarding how to balance the funding. needs of different functions of county government.
The majority’s remaining arguments are unconvincing. Application of the presumption that a non-civil service position is subject to patronage dismissal cannot overcome the fact that administrators simply do not meet the requirements of McCloud category two. Nor is the reasoning of Soelter v. King County, 931 F.Supp. 741 (W.D.Wash.1996) persuasive. The elections manager at issue in that case appeared to enjoy significantly more policymaking responsibility, for example, in determining the “manner in which county or local elections are conducted,” determining “in some cases, whether special elections will be conducted” at all, and lobbying and drafting official legislation as a representative of the county executive. 931 F.Supp. at 745-46. McConnell v. Adams, 829 F.2d 1319 (4th Cir.1987) is a much better guide for the present case. There, the Fourth Circuit held that a position comparable to a county election administrator was protected from patronage dismissal where the statute required “certain political party affiliation for members of electoral boards,” but not for the registrars, and it did not appear that “political party affiliation would either enhance or detract from a registrar’s job performance.” Id. at 1324. The court explained that “[w]hile the Virginia statutory scheme may facilitate political patronage in the appointment of registrars, this alone does not satisfy the Branti standard. Party affiliation must be more than a matter of convenience; it must be an appropriate requirement fqr the position.” Id.
In sum, the duties of the administrators do not entail the type of discretionary authority that under McCloud’s category two renders political affiliation with the reigning party on the commission an appropriate qualification for office.
III.
Finally, county election administrators cannot reasonably be considered category *355 three officials under the McCloud framework. Category three “is concerned with [an] employee’s access to confidential, political information transmitted to the policymaker, which requires political loyalty.” Sowards v. Loudon Cnty., Tenn., 203 F.3d 426, 437 (2000). The primary flaw in applying category three to county election administrators is that there is no evidence from the description of their statutory duties or otherwise that they are in a confidential relationship — a necessary element of the category — with the county election commissions. McCloud, 97 F.3d at 1557 (describing category three employees as “confidential advisors ... or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors.”) (emphasis added). To the contrary, meetings of the commission are governed by Tennessee’s open meetings law. Tenn.Code Ann. § 8-44-101 et seq.
An official serving a multi-member commission composed of representatives from opposing political parties cannot be presumed to occupy a position of confidential trust in a manner analogous to category one officials and their chief deputies or staff advisors. In some cases, other facts may establish confidentiality, such as the lawyer-client relationship between a city attorney and the city council. No such extenuating circumstances are applicable here. Therefore, I cannot agree with the majority that Plaintiffs were subject to patronage dismissal as category three employees.
CONCLUSION
Because county election administrators enjoy neither the discretionary authority on issues of political importance nor the confidential relationship with their commissions that would render them exempt from First Amendment protections, I would reverse the district court’s grant of summary judgment. Additionally, because the McCloud categories were clearly established as the framework guiding application of the Elrodr-Branti exception in this circuit, and because the reasoning above regarding their duties is an uncomplicated application of McCloud, I would also reverse the grant of qualified immunity.

. Although it is true these decisions were not reached with any reference to the Elrod-Branti exception to First Amendment protection against patronage dismissal, the state high court's consistent description of commissioners as ministerial officers is impossible to reconcile with the degree of discretionary authority envisioned in McCloud category one. The majority distinguishes this clear precedent from the Tennessee Supreme Court as involving "entirely inapposite contexts, with little or no bearing on the issues relevant to an Elrod-Branti exception analysis.” Maj. Op. at 347. I do not perceive how the context of these decisions could be "inapposite” to an analysis that considers the “inherent duties” of a given position. Heggen v. Lee, 284 F.3d 675, 681 (6th Cir.2002).